## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MARCUS UNDERWOOD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.:  2:15-cv-01585-JHE |
| | ) | |
| THE CITY OF BESSEMER, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### MEMORANDUM OPINION[1][2]

Plaintiff Marcus Underwood ("Underwood" or "Plaintiff") brings this action pursuant to 42 U.S.C. § 1983 against Defendants the City of Bessemer ("Bessemer"); Bessemer Chief of Police Nathaniel Rutledge ("Chief Rutledge"), in both his individual and official capacity; Bessemer Police Department Officer Daniel Cecil Partridge ("Officer Partridge"), in both his individual and official capacity; and Bessemer Police Officer Christopher Asarisi ("Officer Asarisi"), in both his individual and official capacity (collectively, the "Defendants"). Defendants have moved for summary judgment on all of Underwood's claims, (doc. 43), and Underwood has moved for partial summary judgment, (doc. 45). Additionally, the parties have each moved to exclude evidence, (docs. 31 & 39), and Defendants have moved to strike the evidence submitted

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including trial and the entry of final judgment. (Doc. 10).

[2] A previous version of this memorandum opinion was entered on September 28, 2018. (Doc. 66). For the reasons explained more fully in the memorandum opinion addressing Plaintiff's motion to alter the judgment, (doc. 75), that opinion has been withdrawn and this memorandum opinion substituted.

by Underwood that is the subject of their evidentiary motion, (doc. 51). Finally, Defendants have moved for sanctions against Underwood. (Doc. 50). Each of those motions is fully briefed and ripe for review. (Docs. 36, 42, 53-1, 54, 55, 56, 57, 58, 59, 64 & 65).[3] For the reasons stated below, Defendants' motion for summary judgment is **GRANTED**, and Underwood's motion for summary judgment is **DENIED**.[4]

## I. Standard of Review

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 447 U.S. 317, 322 (1986). The moving party bears the initial burden of proving the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party, who is required to "go beyond the pleadings" to establish that there is a "genuine issue for trial." *Id.* at 324. (citation and internal quotation marks omitted). A dispute about a material fact is genuine "if the evidence is such that

---

[3] As discussed further below, Underwood has withdrawn his initial brief in support of his motion for summary judgment, (doc. 46), and substituted a copy omitting challenged evidence Underwood had previously stated he did not intend to rely upon, (doc. 53-1). Unless relevant to the discussion, this memorandum opinion cites to Underwood's corrected summary judgment brief rather than his original summary judgment brief.

[4] Both parties have requested oral argument on their motions, but the undersigned does not find oral argument would be necessary or helpful in this case.

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court must construe the evidence and all reasonable inferences arising from it in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Anderson*, 477 U.S. at 255 (all justifiable inferences must be drawn in the non-moving party's favor). Any factual disputes will be resolved in Plaintiff's favor when sufficient competent evidence supports Plaintiff's version of the disputed facts. *See Pace v. Capobianco*, 283 F.3d 1275, 1276-78 (11th Cir. 2002) (a court is not required to resolve disputes in the non-moving party's favor when that party's version of the events is supported by insufficient evidence). However, "mere conclusions and unsupported factual allegations are legally insufficient to defeat a summary judgment motion." *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) (per curiam) (citing *Bald Mtn. Park, Ltd. v. Oliver*, 836 F.2d 1560, 1563 (11th Cir. 1989)). Moreover, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson*, 477 U.S. at 252).

## II. Evidentiary Objections

Both parties have presented motions to strike summary judgment evidence, as well as other challenges to opposing evidence. (Docs. 31, 39 & 51). With the December 1, 2010 rules change to Rule 56 of the Federal Rules of Civil Procedure, motions to strike submitted on summary judgment are no longer appropriate. Revised Rule 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." The Advisory Committee Notes specify as follows:

Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

FED. R. CIV. P. 56, Adv. Comm. Notes, "Subdivision (c)" (2010 Amendments). "Before this amendment, parties properly challenged evidence used in a summary judgment motion by filing a motion to strike. The plain meaning of these provisions shows that objecting to the admissibility of evidence supporting a summary judgment motion is now a part of summary judgment procedure, rather than a separate motion to be handled preliminarily." *Campbell v. Shinseki*, 546 F. App'x 874, 879 (11th Cir. 2013).

### A. Lawdon H. Yates

Defendants seek to exclude testimony or evidence from Underwood's expert Lawdon H. Yates. (Doc. 31). Defendants state Underwood failed to disclose Yates's report by the scheduling order's deadline for disclosure of expert reports. (*Id.*). Underwood argues Yates was not timely disclosed because he did not intend to use Yates as a testifying expert, but rather as a consulting expert, and in any event Defendants have not been harmed by the late disclosure because he "does not intend to use Yates's report in support [of] or opposition to any dispositive motions due to be filed" in this case. (Doc. 36). Contrary to this representation, though, Underwood's initially-submitted summary judgment brief contains a paragraph relying on Yates's conclusions, (doc. 46 at 11-12, ¶ 28), and his summary judgment evidence contains Yates's expert report, (doc. 47-10).

Defendants have moved to strike the paragraph and the report. (Doc. 51). Underwood concedes the motion is well-taken; therefore, he has withdrawn the exhibit and submitted a corrected summary judgment brief, omitting the paragraph that references Yates. (Docs. 53 & 53-1). Consequently, Defendants' motion to strike, (doc. 51), is **DENIED AS MOOT**. The remainder of Defendants' evidentiary objections, as well as Defendants' motion for sanctions, are not relevant to the resolution of the motions for summary judgment, and the undersigned declines to address them.

### B. Christopher Lawrence

Underwood objects to the report of Defendants' use of force expert, Christopher Lawrence, on the following grounds: (1) Lawrence's report is founded on the version of events relayed by Officers Asarisi and Partridge, rather than the totality of the circumstances; (2) Lawrence is unqualified to offer opinion evidence on general police procedures, given Bessemer's official policy; (3) Lawrence's opinions on the turning radius of the vehicle driven by Underwood at the time of the incident at issue fail to account for variables at the scene; (4) a study relied upon by Lawrence for his opinion on police officers' reduced mobility in full gear fails to account for variables at the scene; (5) Lawrence's opinion on "looming" fails to account for variables at the scene; (6) Lawrence's opinions on officers' focus of attention does not account for the reliability of the studies that Lawrence relies upon; (7) Lawrence's opinions on stress response unreasonably credits the accounts of Officers Asarisi and Partridge over other witnesses; and (8) Lawrence's opinions on reaction times have no bearing on the facts at issue in this case and are based on a computer program whose reliability he fails to discuss. (Doc. 39). Because none of the opinions Underwood challenges are necessary to resolve the motions for summary judgment, the

undersigned declines to address the evidentiary objection and will consider the motions for summary judgment without reference to Lawrence's report.

## III. Summary Judgment Facts[5]

### Incident

On June 14, 2014, around midnight, Elizabeth "Lee" Harrington ("Harrington"), a resident of Holbrook Avenue in Bessemer, Alabama, was awakened from her sleep by her partner, Dana Darby ("Darby"), who told her she had heard people arguing loudly across the street and "two pops." (Doc. 37-3 at 4 (14:1-2), 6 (23:18-24:3)). Harrington called 911, and the following exchange took place:

> DISPATCHER: Bessemer 911, 2 state your emergency.
>
> SPEAKER 1:[6] Yes, there's been a domestic on Holbrook and -- between Holbrook and 17th and 16th Street, gunshots have been fired. They're arguing and --
>
> FEMALE DISPATCHER: Anybody hurt?
>
> SPEAKER 1: I don't know, I don't know. I don't want to go outside and see, in other words. We're just hearing arguments and just yelling and gunshots.
>
> FEMALE DISPATCHER: Is it between a male and a female?
>
> SPEAKER 1: I don't know, I'm not going outside to see.
>
> FEMALE DISPATCHER: And you – you hear the domestic going on?

---

[5] Although both parties have moved for summary judgment, the resolution of Defendants' motion for summary judgment is dispositive of the issues on which Underwood moves for summary judgment. Therefore, the following facts are undisputed, or, if disputed, they are taken in the light most favorable to Underwood. Where the parties nominally dispute facts, but the evidence does not support the dispute is genuine, the undersigned has addressed the "dispute" in footnotes. *See Pace*, 283 F.3d at 1276-78.

[6] The transcript of this phone call refers to Harrington as "SPEAKER 1."

SPEAKER 1: Right. We hear yelling, yelling and then two gunshots.

FEMALE DISPATCHER: Bessemer is coming. I made a call, that's where the caller lives. You said 16th and 17th Holbrook Avenue right?

SPEAKER 1: Right, in between, yeah.  I can still hear the yelling, okay, so.

FEMALE DISPATCHER: Is it male and female, or do you hear two males or --

SPEAKER 1: I can't -- I can't tell.

FEMALE DISPATCHER: I'm going to stay on the phone with you until they get there.   Just let me know if you hear any more shots.

SPEAKER 1: It sounds like a female and a male.

(Doc. 37-1 at Track 1;[7] doc. 37-2 at 2).

Bessemer Police Department ("BPD") dispatcher Bess Griffin transmitted the following: "208, 208 respond to Holbrook Avenue, 17th and 18th Holbrook Avenue -- correction, 17th and 16th. It's going to be a domestic, shots fired. Domestic, shots fired, 10-33.[8] It's going to be yelling and involved two shots fired. Yelling involved, two shots fired, unknown if anybody is down." (Doc. 37-1 at 1-2, Track 2; doc. 37-2 at 5).   After indicating units were responding to the scene, the dispatcher also stated: "it sounds as if it is between a female and a male, a female and a male." (Doc. 47-4 at 6 (2:1-3)).

---

[7] Doc. 37-1 contains two audio recording sub-exhibits.  Track 1 is a recording of Harrington's 911 call.   Track 2, discussed below, is a recording of the police dispatcher's transmission.

[8] "10-33" refers to an individual with a weapon.  (Doc. 37-1 at 2).

Officers Asarisi and Partridge were both working the "C" shift — between 10:00 p.m. and 6:00 a.m. — that night.[9]  (Doc. 37-5 at 10 (34:2-9); doc. 37-6 at 4 (11:23-12:7)).[10]  Both responded to the domestic violence call.  Both officers were driving BPD patrol vehicles, and both were in uniform and wearing their duty belts (consisting of a firearm, handcuffs, a baton, pepper spray, a radio, and a flashlight).  (Doc. 37-5 at 15 (56:4-12), 18 (67:24-68:7)).  On the way to the scene, each officer initially had his lights and siren on, but each turned off his lights and siren as he approached the scene; Officer Asarisi testified he did so because he wanted to avoid broadcasting his presence due to the report of shots fired, while Officer Partridge stated he "didn't want [a suspect] to take off running and try to leave the scene when they hear us coming."  (Doc. 37-5 at 18 (66:9-67:2); doc. 37-6 at 12 (44:10-23)).

The portion of Holbrook Avenue where the incident occurred is a two-lane residential street, with houses on both sides and a grassy median separating the northbound lane from the southbound lane.  (*See* doc. 47-5).  Arriving on the scene, Officer Asarisi parked "just into the median," and Officer Partridge, who arrived shortly afterwards, parked on the street roughly ten or fifteen feet behind Officer Asarisi's vehicle.  (Doc. 37-5 at 19 (71:22-72:25), 23 (87:7-12); doc. 37-6 at 13 (6-23)).

---

[9] Both officers initially indicated in post-incident statements that dispatch had reported that a black male had a gun.  (Doc. 47-8 at 114-117).  However, in their depositions, both stated they were mistaken about this fact.  (Doc. 37-5 at21 (81:3-20); doc. 37-6 at 10 (36:24-37:14)).

[10] Both parties have submitted the depositions of Officer Asarisi and Officer Partridge in support of their motions for summary judgment.  For convenience, this memorandum opinion refers to the exhibits submitted in support of Defendants' motion for summary judgment.

About fifteen or twenty feet in front of Officer Asarisi's vehicle, parked in the street, was a Nissan Maxima with its engine running and its headlights on. (Doc. 37-5 at 20 (74:13-20); doc. 37-6 at 13 (47:20-23)). Two black males — Underwood and Ray Merquell James ("James"), (doc. 19 at ¶ 15) — were behind the Nissan, talking loudly in what Officer Asarisi testified sounded like an argument. (Doc. 37-5 at 20 (74:13-75:7)). Officer Asarisi could see both men from the waist up, but did not notice whether either had a weapon in his hand. (Doc. 37-5 at 20 (75:22-76:2)). Officer Partridge was also unable to judge whether the men had anything in their hands. (Doc. 37-6 at 13 (49:14-17)).

As Officer Asarisi exited his patrol vehicle, Underwood began walking towards the Nissan. (Doc. 37-5 at 20 (76:9-77:24)). As he made his way to the Nissan, Underwood saw Officer Asarisi and his patrol vehicle and told Officer Asarisi that James was "clowning." (Doc. 37-5 at 20 (76:9-15)). After he exited his own vehicle, Officer Partridge observed James, who was between two houses on Holbrook, walk from one house towards the other. (Doc. 37-6 at 13 (49:3-13)). Officer Asariri did not perceive either man's actions as threatening towards him, but rather as an indication that "they both did not want to be there around [Officer Asarisi] and were making an attempt to get away from [him]." (Doc. 37-5 at 20 (76:25-77:6)). To avoid "rush[ing] into a situation where someone possibly has a gun," the officers were hanging back at their vehicles. (Doc. 37-5 at 28 (106:2-6)).

As Underwood walked to the Nissan's driver's side door, Officer Asarisi instructed Underwood not to get into the car. (Doc. 37-5 at 20 (77:13-24)). Underwood, continuing to insist James was "clowning," got into the car. (Doc. 37-5 at 20 (77:21-24)). Officer Asarisi testified

there was nothing illegal about the running car at this time beyond that it was parked in the middle of the street. (Doc. 37-5 at 22 (83:17-21)).

Meanwhile, seconds onto the scene, Officer Partridge's attention was on James, and he was walking across the street to get him. (Doc. 37-5 at 27 (106:6-22); doc. 37-6 at 13-14 (49:19-21, 50:24-51:1)). Officer Partridge shined his flashlight on James and began to cross the street, yelling to Officer Asarisi to "watch it" (in reference to James). (Doc. 37-6 at 13-14 (49:19-51:1)). Officer Partridge did not recall whether he had made it fully across the street as he did so. (Doc. 37-6 at 14 (50:23)).

Underwood put the Nissan in drive and took his foot off the brake, causing the car to begin rolling forward under its own power, but not accelerating, towards Officer Asarisi, who was standing beside his patrol vehicle. (Doc. 37-5 at 23 (89:1-8), 24 (91:1-3), 26 (100:25-101:10)). Initially, Officer Asarisi did not find this to be threatening; instead, it appeared as though Underwood was attempting to flee the scene. (Doc. 37-5 at 23 (89:9-23)). As the Nissan approached Officer Asarisi, he screamed at Underwood to "stop the fucking car," and slapped the front of the vehicle. (Doc. 37-5 at 23-24 (89:24-90:16), 27 (103:14-17)). Harrington heard Officer Asarisi yell "stop" from across the street. (Doc. 19 at ¶ 18; doc. 37-3 at 15 (58:19-59:7)). As Underwood passed Officer Asarisi, Officer Asarisi pressed his body against his patrol vehicle; although the Nissan came close to him, it did not hit or injure him.[11] (Doc. 37-5 at 24 (91:5-14)).

---

[11] Harrington, who by this point had stepped outside, did not see Underwood outside of the car, nor did she see the vehicle before it started to move. (Doc. 37-3 at 15 (58:7-12)). She observed Underwood's vehicle going past the "tall, thin police officer" — Officer Asarisi — but was unsure where it had come from. (*Id.* at 15, 17 (60:1-3, 65:13-21)).

Underwood did not accelerate the vehicle towards Officer Asarisi during this process. (Doc. 37-5 at 25 (97:8-16)).

Officer Partridge also yelled at Underwood to stop his vehicle. (Doc. 37-5 at 28 (107:10-108:2); doc. 37-6 at 14 (56:9-10)). Underwood did not stop. (Doc. 37-3 at 15 (60:9-10); doc. 37-6 at 15-16 (56:14-58:11)). Instead, Officer Partridge testified that Underwood slowed his vehicle down to the point that it appeared to Officer Partridge that he was going to stop, but never actually stopped moving. (Doc. 19 at ¶ 18; doc. 37-2 at 13; doc. 37-3 at 15 (60:9-10); doc. 37-6 at 15 (56:14-17)). When Officer Partridge realized Underwood's car was moving towards him, he drew his service weapon. (Doc. 37-6 at 15 (55:22-24); doc. 19 at ¶ 19; doc. 44-1 at 3-4)). Officer Partridge testified he did so because the vehicle was still moving towards him, and it was a deadly weapon. (Doc. 37-6 at 15 (59:24-60: 6)). The Nissan was about eight feet away from Officer Partridge when Underwood slowed down to the point Officer Partridge believed Underwood was going to stop; Officer Partridge was in front of the car but walking back across the road towards the Nissan's driver's side. (Doc. 37-6 at 15 (56:14-25), 16 (60:7-18)). From his vantage point close to the back driver's side window of the Nissan, Officer Asarisi could see Officer Partridge in the middle of the street, directly in front of the vehicle, when he pointed his weapon at Underwood. (Doc. 37-5 at 27-28 (105:13-107:7)).[12]

---

[12] Underwood characterizes portions of this account as "disputed." (Doc. 58 at 8, ¶ 24). The alleged dispute is not that the car was moving towards Officer Partridge nor that Officer Partridge drew his weapon, but instead that Officer Partridge's testimony that he "continued to walk the entire time," (doc. 37-6 at 15 (56:24-25)), "suggest[s] that he was removing himself out of the path of the vehicle and then chose to stop and pull his weapon." (Doc. 58 at 8, ¶ 24). Underwood cites no evidence to support this, and this is not a reasonable inference given Officer

Officer Partridge stated in a post-incident interview that after he heard Officer Asarisi tell Underwood to stop:

> [t]he car was rolling towards me. I stopped, grabbed my attention to the car. The guy slows down almost to a stop. I holstered my flashlight and pulled my service weapon and pointed my light on it at — my light's directly in his face, he looks directly at me and hits the gas, as I was then telling him to stop.

(Doc. 47-7 at 3 (3:13-18)). As Underwood accelerated, in Officer Partridge's account, he was coming straight towards Officer Partridge. (Doc. 44-1 at 4). Neither Officer Partridge nor Officer Asarisi could judge the speed of the Nissan beyond Officer Asarisi's assertion it was "accelerating quickly." (Doc. 37-5 at 26 (100:9-16); doc. 37-6 at 16 (58:4-5)). Contrary to both officers' account, Harrington testified that the Nissan was moving at the same speed the entire time. (Doc. 37-3 at 17 (65:11-66:8). In his affidavit in support of Defendants' motion for summary judgment, Officer Partridge stated he was concerned Underwood may have had a gun, concerns that grew stronger after Underwood failed to stop the car in response to the officers' instructions. (Doc. 44-1 at 3).[13] Officer Partridge testified Underwood driving towards him made him believe that Underwood was using deadly force against him; in other words, "trying to kill" him. (Doc. 37-6

_____

Partridge's testimony that he was approaching the Nissan's driver's side. Further, Underwood offers no explanation for how this suggested inference supposedly undermines that the Nissan moved towards Officer Partridge or that Officer Partridge drew his weapon when he realized that fact.

[13] Underwood states he disputes this fact. However, he challenges "Bess Griffin's declaration authenticating a 911 audio recording," (doc. 58 at 12, ¶ 36), which Defendants do not cite in support of the fact. The remainder of his "factual dispute" is a legal argument about what a reasonable officer would have concluded under the totality of the circumstances, a citation to BPD training, and a discussion of whether the officers attempted to ascertain if Underwood had a firearm. None of this creates a factual dispute as to Officer Partridge's testimony.

at 24 (92:20-93:23); Doc. 44-1 at ).[14]  In response to the oncoming vehicle, Officer Partridge

testified he began "firing into the vehicle because it was a deadly weapon coming at [him]."  (Doc.

37-6 at 17 (63:20-24); doc. 44-1 at 4).[15]

Underwood's vehicle struck Officer Partridge, but did not injure him.[16]  (Doc. 37-6 at 16

(60:22-61:8)).  Officer Partridge continued to fire at the car as it drove past, firing a total of nine

shots.  (Doc. 37-6 at 16-17 (61:18-62:3)).  At about the time the vehicle struck Officer Partridge,

---

[14] Underwood purports to dispute Officer Partridge's belief by stating "Officer Partridge admitted he had no idea what Plaintiff intended, did not see him commit any crime and, in fact, admitted that Plaintiff did nothing prior to him allegedly being struck by the vehicle."  (Doc. 58 at 14-15, ¶ 40).  Underwood does not cite any evidence for this statement, nor would it create a factual dispute as to Officer Partridge's subjective belief if he did.  The remainder of Underwood's dispute is a legal conclusion, which also does not create a factual dispute.

[15] Underwood states this fact "requires clarification in that Officer Partridge created that danger by knowingly stepping directly in front of the path of a moving vehicle."  (Doc. 58 at 15, ¶ 43) (citing doc. 37-6 at 15-16 (55-56, 60)).  This claim, reiterated at various points in Underwood's recounting of the facts, is essentially a legal conclusion, and it is discussed further below.

[16] Underwood disputes that Officer Partridge was hit by the Nissan on his left side, pointing to Officer Partridge's inconsistent accounts of where he was hit.  Officer Partridge testified that the front left side of Underwood's vehicle struck him on his left side.  (Doc. 37-6 at 16 (60:22-25)).  However, Officer Partridge also stated he did not know where Underwood's car hit him, just that "it spun [him] to the side . . . [a]nd then it threw [him] off balance," (doc. 47-7 at 3 (4:1-11)), and his affidavit does not indicate where the car hit him, (doc. 44-1 at 4).  None of this refutes that the Nissan hit Officer Partridge.  Underwood also points to an FBI lab test that failed to find paint from the car on Officer Partridge's holster, which Officer Partridge stated had come into contact with the car, (doc. 47-7 at 3 (4:9-11)).  Contrary to Underwood's contention, Officer Partridge did not testify that contact with the car had "left paint residue on his holster," only that he "scraped [his] holster on the car."  (Doc. 47-7 at 3 (4:9-11)).  And while the FBI lab test showed no paint on the holster, that "result can be interpreted in several possible ways: 1) the holster did not come into forcible contact with a vehicle, 2) automotive paint may not have transferred during a contact, or 2) automotive paint that did transfer may have been dislodged prior to submission to the laboratory."  (Doc. 47-8 ay 107).  In other words, the FBI's testing neither supports nor refutes that Underwood was hit by the Nissan, and the only inference in Underwood's favor it supports is that the Nissan did not hit Officer Partridge's holster, not that it did not hit him at all.

Officer Asarisi began firing his weapon.[17]  (Doc. 37-5 at 28 (111:12-22)).  Officer Asarisi fired approximately eleven rounds.  (Doc. 37-5 at 29 (111:23-112:4), 32 124:14-18)).  The officers continued firing over a matter of about five seconds.  (Doc. 37-1 Track 1 at 00:03:20-00:03:25).  Around the time of the shooting, an unidentified 911 caller reported that "the police were telling him to stop and the guy in the car wouldn't stop and that's when . . . bang, bang, bang, bang, bang . . . the police were shooting at him."  (Doc. 37-2 at 13).  Once Officer Partridge "realized Underwood was no longer a threat and continuing to flee, [he] holstered [his] weapon and ran to [his] patrol car."  (Doc. 37-6 at 17 (62:6-14)).

With five bullet wounds, Underwood continued to drive, ultimately crashing his vehicle into a neighbor's home a short distance away.[18]  (Doc. 19 at ¶ 21).  Underwood then exited his vehicle, seeking assistance at another neighbor's house.  (Doc. 19 at ¶ 23).  Officer Partridge and approximately six other officers discovered him there, secured him, and transferred him to the UAB Hospital.  (Doc. 19 at ¶ 28; doc. 37-6 at 20 (74:23-25)).

---

[17] Underwood disputes this fact, contending "Harrington states Asarisi began shooting as soon as the car passed by him."  (Doc. 58 at 17, ¶ 49).  Again, the cited testimony does not support Underwood's characterization.  Harrington testified "I observed the car moving.  I heard gunfire — this is the first time I heard gunfire . . . I'm referring to when the car passed the officer . . . And the officer turned — said 'Stop.'  And as the car went by him, and the officer turned and fired shots into the back of the car.  That's the only time I heard gunfire."  (Doc. 37-3 at 12 (46:16-47:19)).  This does not support that Officer Asarisi fired "as soon as the car passed by him" rather than as the Nissan hit Officer Partridge.  In fact, Harrington specifically noted she did not know where Officer Partridge was at the time of the incident.  (Doc. 37-3 at 17 (65:19-21)).

[18] This fact, which Underwood purports to dispute on the basis that it does not take into account whether he was conscious or in shock, (doc. 58 at 17, ¶ 53), is taken directly from Underwood's complaint.

On January 30, 2015, Underwood was indicted by a Jefferson County grand jury on charges of attempted murder and attempting to flee or elude a law enforcement officer. *See* https://v2.alacourt.com, *State of Alabama v. Marcus Keonnie Underwood*, Case No. 68-CC-2015-000377.00 ("*Underwood I*") at doc. 1; *State of Alabama v. Marcus Keonnie Underwood*, Case No. 68-CC-2015-00378.00 ("*Underwood II*") at doc. 1.[19] On March 4, 2016, the district attorney moved to dismiss the charges without prejudice due to the unavailability of a witness and to amend the indictment to include additional facts. (Doc. 37-13); *Underwood I* at doc. 25; *Underwood II* at doc. 20. The state court granted those motions on April 5, 2016 and April 8, 2016. *See Underwood I* at doc. 29; *Underwood II* at doc. 22.

### Subsequent Investigation

Chief Rutledge testified that, per BPD policy, an internal affairs investigation of a citizen complaint or officer-involved shooting is conducted through interviews of all the people identified in the complaint and taking statements of all relevant witnesses. (*Id.* at 9 (25:19-26:17)). Once all interviews are completed, internal affairs offers conclusions as to what occurred and renders one of four possible decisions as to the outcome: exonerated, sustained, not sustained, or unfounded. (*Id.* (26:18-22); doc. 47-15 at 18 (90:2-11)). Chief Rutledge testified he did not know

---

[19] Neither party includes evidence to support this, but the court takes judicial notice of the state court records available on the state's Alacourt website. *See* FED. R. EVID. 201; *Keith v. DeKalb County, Ga.*, 749 F.3d 1034, 1041 n.18 (11th Cir. 2014) (taking judicial notice of DeKalb County Superior Court Online Judicial System pursuant to Federal Rule of Evidence 201).

what specific standard of proof internal affairs uses, but that "all facts are necessary to review."[20] (Doc. 47-11 at 9 (26:23-28:13)).

Lieutenant Roy Harris ("Lieutenant Harris"), the BPD internal affairs administrator, investigated the incident. (Doc. 47-11 at 7 (17:6-9)). Chief Rutledge's role in the process was to review the reports summarizing complaints and findings submitted by Lieutenant Harris. (Doc. 47-11 at 9-10 (26:8-30:9)). Chief Rutledge testified he primarily relies on Lieutenant Harris to provide appropriate information to him, and he reviews the reports to see if there is anything missing. (Doc. 47-11 at 9-10 (26:8-30:9)).

Relying primarily on the officers' statements, the incident offense report, and the call for service, Lieutenant Harris ultimately issued a report exonerating both officers (i.e., finding the incident occurred, but it was lawful and proper). (Doc. 47-15 at 21 (102:3-104:3)). Chief Rutledge made no revisions to this report. (Doc. 47-15 at 7 (46:17-48:10)).

## IV. Analysis

Underwood's amended complaint contains the following counts: (I) a § 1983 Fourth Amendment unlawful detention count against all defendants,[21] (doc. 19 at ¶¶ 37-41); (II) a § 1983 Fourth Amendment excessive force count against all defendants, (*id.* at ¶¶ 42-46); (III) a § 1983

---

[20] Underwood characterizes Chief Rutledge's testimony as "confirm[ing] that [internal affairs] has not adopted and does not apply any specific standard of proof," but the cited testimony supports only Chief Rutledge's lack of knowledge of the standard.

[21] As with several other counts, Underwood purports to assert Count I against the BPD. (*See* doc. 19 at ¶ 39). However, Underwood's complaint does not identify the BPD as a separate party, but as "an organizational unit within the Bessemer city government." (*Id.* at ¶ 5). Underwood does not appear to draw any distinction between the BPD and Bessemer and did not serve the BPD separately. This memorandum opinion considers the two entities as a single defendant.

Fourth Amendment malicious prosecution count against all defendants, (*id.* at ¶¶ 47-50); (IV) a § 1983 Fourth Amendment conspiracy count against all defendants, (*id.* at ¶¶ 51-54); (V) a state law assault and battery count against all defendants, (*id.* at ¶¶ 55-58); (VI) a state law negligent hiring count against Bessemer and Chief Rutledge, (*id.* at ¶¶ 59-62); (VII) a state law negligent training and supervision count against Bessemer and Chief Rutledge, (*id.* at ¶¶ 63-66); and (VII) a state law tort of outrage count against all defendants, (*id.* at ¶¶ 67-70).

Both parties have moved for summary judgment on the Count I unlawful detention claim and the Count II excessive force claim, as well as the issue of municipal liability for those claims. (*See* docs. 43 & 53-1). Additionally, Defendants have moved for summary judgment on the remainder of Underwood's claims. (*See* doc. 43). Underwood expressly incorporates his briefing and evidence in support of his motion for summary judgment into his response to Defendants' motion for summary judgment. (Doc. 58 at 1). As stated above, resolving Defendants' motion disposes of Underwood's motion, and the undersigned has considered all of Underwood's briefing and evidence in the context of Defendants' motion.

## A. § 1983 Claims

Underwood's § 1983 claims against Officers Partridge and Asarisi in their individual capacities, against Bessemer,[22] and against Chief Rutledge in his individual capacity are analyzed separately below.

_____

[22] Official capacity claims "'generally represent only another way of pleading an action against an entity of which an officer is an agent.' As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985)

### 1. Officer Partridge and Officer Asarisi (Individual Capacity)

#### a. Counts I and II - Unlawful Detention and Excessive Force

Defendants assert the undisputed facts show Officers Asarisi and Partridge did not violate Underwood's Fourth Amendment rights and, in any event, they are shielded by qualified immunity. (Doc. 43 at 11-19). Underwood states the opposite conclusion on the Fourth Amendment violation, (doc. 53-1 at 22-34; doc. 58 at 18-29), and, responding to Defendants' motion for summary judgment, Underwood denies the officers are entitled to qualified immunity, (doc. 58 at 30-32).

"Qualified immunity protects government officials who were sued individually 'unless the law preexisting the defendant official's supposedly wrongful act was already established to such a high degree that every objectively reasonable official standing in the defendant's place would be on notice that what the defendant official was doing would be clearly unlawful given the circumstances.'" *Morton v. Kirkwood*, 707 F.3d 1276, 1280 (11th Cir. 2013) (citation omitted). To receive the protection of qualified immunity, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. *Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004). Once an official establishes he is acting within his discretionary authority, the burden shifts to the plaintiff to demonstrate qualified immunity is inappropriate. *White v. City of Birmingham*, 96 F. Supp. 3d

_____

(quoting *Monell v. Dep't of Soc. Serv.,* 436 U.S. 658, 690 n.55 (1978)). Because Underwood's official-capacity claims against Officer Asarisi, Officer Partridge, and Chief Rutledge are claims against Bessemer, they are not discussed separately.

1260, 1285 (N.D. Ala. 2015).  To determine whether qualified immunity is appropriate, the court asks two questions: (1) "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" (2) "If a violation could be made out on a favorable view of the parties' submissions, . . . [was] the right . . . clearly established?" *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194 (2001)). This two-part analysis may be performed in any order.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

As a preliminary matter, Underwood argues qualified immunity cannot be determined at summary judgment because factual disputes preclude it, and points the court to *Salvato v. Miley*, 790 F.3d 1286 (11th Cir. 2015) and *Simmons v. Bradshaw*, 879 F.3d 1157 (11th Cir. 2018) for this proposition.  (Doc. 58 at 29-32).  Neither case supports Underwood's argument.  The portion of *Salvato* Underwood quotes is the Eleventh Circuit's observation that facts are taken in the light most favorable to the party opposing qualified immunity and not weighed at the summary judgment stage.  *See* 790 F.3d at 1292.  This is a recitation of the legal standard that applies to deciding the issue of qualified immunity at summary judgment, not a prohibition on applying qualified immunity at summary judgment.  As for *Simmons*, Underwood characterizes the case as standing for the proposition that "where material issues of disputed genuine fact exist then summary judgment on the issue of qualified immunity is inappropriate until the case is tried to a jury and any factual disputes resolved."  (Doc. 58 at 31).  However, *Simmons* specifically notes the summary judgment stage is "the most typical juncture at which defendants entitled to qualified immunity are released from the threat of liability and the burden of further litigation," including where "there is some dispute about the facts, but even viewing the evidence most favorably to the

plaintiff the law applicable to that set of facts was not already clearly enough settled to make the defendants' conduct clearly unlawful." *Simmons*, 879 F.3d at 1163 (quoting *Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002)). To the extent Underwood argues the existence of fact issues always preclude the application of qualified immunity on the "clearly established" portion of the qualified immunity analysis, he is mistaken, as *Simmons* states. To the extent he argues the existence of fact issues always preclude the application of qualified immunity on the question of whether the officers violated his constitutional rights, this argument rises and falls with defendants' entitlement to summary judgment in the abstract. Nothing prohibits the court from <u>assessing</u> qualified immunity at summary judgment, even if a fact issue might ultimately preclude the court <u>granting</u> qualified immunity.

Turning to the qualified immunity analysis itself, there is no dispute Officers Partridge and Asarisi were acting within their discretionary authority at the time of the shooting.[23] Therefore, the burden falls to Underwood to meet the two-part *Saucier* test. Underwood's briefing blurs exactly what constitutes the alleged Fourth Amendment violation in this case, so the first step is to define the right Underwood alleges was violated. Underwood's first two counts are based on his contention his Fourth Amendment rights were violated when Officers Partridge and Asarisi shot him. (*See* doc. 19 at ¶¶ 38, 43). For the purposes of the Fourth Amendment, a shooting is a seizure.

---

[23] In any event, it is beyond debate that on-duty police officers responding to a 911 call act "pursuant to their job functions and within the scope of their authority," which is all that is required to establish that they are acting in their discretionary authority for qualified immunity purposes. *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994). *See also Gray v. City of Roswell*, 486 F. App'x 798, 801 (11th Cir. 2012).

*See Tennessee v. Garner*, 471 U.S. 1, 7 (1985). Nominally, as noted above, the first is an unlawful detention count, alleging the officers "unlawfully detained the Plaintiff by shooting him, without warning, reasonable suspicion or probable cause" (doc. 19 at ¶ 38), while the second is an excessive force count, alleging the officers "unlawfully subjected the Plaintiff to an excessively brutal seizure and detention by shooting him, without reasonable suspicion or probable cause, five times and thereby significantly injuring him," (id. at ¶ 43). Notwithstanding the shooting is the Fourth Amendment violation Underwood identifies, a substantial portion of his argument is devoted to whether the officers had reasonable suspicion or probable cause to detain him in the first place. For example, in his motion for summary judgment, Underwood argues no crime was committed in the presence of the officers, and therefore they had neither reasonable suspicion nor probable cause to detain him. (Doc. 53-1 at 25). Underwood also contends the officers improperly assumed he was a suspect and that he had a gun, which he says is insufficient articulable reasonable suspicion to detain him pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968). (*Id.* at 26-29). But the undisputed facts show that Underwood never actually submitted to the officers' authority prior to the shooting. "When a person refuses to submit to an officer's display of authority, there is no Fourth Amendment seizure before a shooting." *Shaw v. City of Selma*, 884 F.3d 1093, 1101 n.9 (11th Cir. 2018) (citing *Menuel v. City of Atlanta*, 25 F.3d 990, 995 (11th Cir. 1994)). This is true even when, as here, an officer points a gun at that person. *Id.* The single seizure Underwood

identifies is the shooting, regardless of the rationale behind it, and thus Underwood's first two counts can only be read as different ways of stating a single excessive force claim.[24]

When an excessive force claim arises out of an arrest or investigatory stop, it is analyzed under the Fourth Amendment; it must be "objectively reasonable in light of the facts and circumstances confronting" the officer. *Graham v. Connor*, 490 U.S. 386, 394-97 (1989). This analysis takes into account the totality of the circumstances surrounding the use of force. *Shaw*, 884 F.3d at 1099. A court considers (1) the severity of the crime at issue; (2) whether the suspect

---

[24] Although he does not make this explicit, Underwood seems to ask the court to find the shooting was unreasonable because his Fourth Amendment rights were violated when the officers attempted to stop him for investigatory purposes. As noted above, there was no seizure prior to the shooting. And even if there was, the Supreme Court recently rejected the approach Underwood advocates. In *City of Los Angeles v. Mendez*, the Court observed that the backward-looking approach of invalidating an otherwise-reasonable use of force due to a prior Fourth Amendment violation "mistakenly conflates distinct Fourth Amendment claims." 137 S. Ct. 1539, 1547 (2017). Instead, the Court held:

> [T]he objective reasonableness analysis must be conducted separately for each search or seizure that is alleged to be unconstitutional. An excessive force claim is a claim that a law enforcement officer carried out an unreasonable seizure through a use of force that was not justified under the relevant circumstances. It is not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation . . . *The* framework for analyzing excessive force claims is set out in *Graham* [*v. Connor*, 490 U.S. 386 (1989)]. If there is no excessive force claim under *Graham,* there is no excessive force claim at all. To the extent that a plaintiff has other Fourth Amendment claims, they should be analyzed separately.

*Id.* (emphasis in original).

Under *Mendez*, the legality of the initial stop would not invalidate an otherwise lawful use of force, so Underwood's emphasis on it is largely misplaced. Responding to Defendants' motion, Underwood appears to acknowledge the limited relevance of his challenge to the initial stop when he notes that "[e]ssentially, as in this case, the circumstances that require or the circumstances officers believe require him or her to stop as [sic] vehicle 'are not relevant to the inquiry regarding [an officer's] ultimate decision to use force.'" (Doc. 58 at 25) (quoting *Scheureman v. City of Huntsville*, 499 F. Supp. 2d 1205, 1219 (N.D. Ala. 2007)).

poses an immediate threat to the safety of the officers or others; (3) and whether the suspect actively resisted arrest or attempted to evade arrest by flight. *Salvato*, 790 F.3d at 1293. However, the touchstone is reasonableness, and "none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect." *Penley v. Eslinger*, 605 F.3d 843, 850 (11th Cir. 2010) (citing *Scott v. Harris*, 550 U.S. 372, 382 (2007)). "If a reasonable officer could have believed that under the circumstances [a suspect] posed a threat of inflicting serious injury or death on him, the [use of force is] objectively reasonable regardless of whether [the suspect] had already committed a crime or was resisting or attempting to evade arrest." *Shaw*, 884 F.3d at 1099 n.5. In assessing the reasonableness of a particular use of force, a court may not rely on hindsight, but must make its determination from the perspective of a reasonable officer on the scene. *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009).

Adhering to the principle that "it is reasonable, and therefore constitutionally permissible, for an officer to use deadly force when he has 'probable cause to believe that his own life is in peril.'" *Hammett v. Paulding City*, 875 F.3d 1036, 1048 (11th Cir. 2017) (quoting *Singletary v. Vargas,* 804 F.3d 1174, 1181 (11th Cir. 2015)), the Eleventh Circuit has "consistently upheld an officer's use of force and granted qualified immunity in cases where the decedent used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough*, 559 F.3d at 1207. In *McCullough*, the court granted qualified immunity to police officers who fired at a truck driver. After a high-speed chase, officers had surrounded the truck driver's vehicle in a parking lot. *Id.* at 1203. When two officers heard the truck's engine revving, they fired through the driver's side windshield, and other officers continued to fire at the vehicle as it drove towards a police car, forcing an officer to jump onto the

hood to avoid being hit, and then drove away. *Id*. The driver died at the scene. *Id*. The Eleventh

Circuit noted the case was similar to others in which it had found the use of force constitutional:

> In *Pace v. Capobianco,* 283 F.3d 1275 (11th Cir. 2002), for example, a panel of
> this Court upheld the officer's use of deadly force against a fleeing suspect who, a
> few seconds before the shooting, had been driving hazardously and had swerved
> his car at police officers. *Id*. at 1277, 1282. We found the use of force constitutional
> because "[the decedent] would have appeared to reasonable police officers to have
> been gravely dangerous" at the time of the shooting, based on his aggressive and
> reckless driving as well as his failure to heed police warning. *Id*. at 1292.
>
> In *Robinson v. Arrugueta,* 415 F.3d 1252 (11th Cir. 2005), a panel of this Court,
> relying on similar reasoning, granted qualified immunity to an officer who used
> deadly force when a suspect slowly — at one or two miles per hour — drove a
> vehicle forward toward the officer who was standing between the suspect's vehicle
> and a parked car. We said that the use of deadly force was reasonable because
> "[e]ven if in hindsight the facts show that Arrugueta perhaps could have escaped
> unharmed . . . a reasonable officer could have perceived that [decedent] was using
> the Escort as a deadly weapon . . . [and thus] Arrugueta had probable cause to
> believe that [he] posed a threat of serious physical harm." *Id*. at 1256.
>
> Finally, in *Long v. Slaton,* 508 F.3d 576 ([11th Cir.] 2007), a panel of this Court
> found no excessive force violation and granted qualified immunity to officers who
> used deadly force against a mentally unstable person who had avoided police
> capture, stole a marked police cruiser, and was attempting to drive the police cruiser
> toward the road. *Id*. at 578–79. We held that "[a]lthough at the point of the shooting
> Long had not yet used the police cruiser as a deadly weapon, Long's unstable frame
> of mind, energetic evasion of the deputy's physical control, Long's criminal act of
> stealing a police cruiser, and Long's starting to drive — even after being warned of
> deadly force — to a public road gave the deputy reason to believe Long was
> dangerous." *Id*. at 581–82 (internal citation omitted).

*McCullough*, 559 F.3d at 1207. Therefore, the court found no Fourth Amendment violation. *Id*.

Similarly, in *Terrell v. Smith*, 668 F.3d 1244 (11th Cir. 2012), a driver, ordered to kneel on

the ground by police officers who had stopped his vehicle for driving without headlights, suddenly

jumped in his car and began to make a U-turn in the direction of one of the officers. *Id*. at 1249.

The officer continued to run alongside the vehicle as it moved, warning the driver to stop. *Id*. As

he pursued the driver, the vehicle's door and frame struck him. *Id*. After multiple warnings, the officer opened fire, killing the driver. *Id*. The Eleventh Circuit found no Fourth Amendment violation. Discussing the above cases, the court noted "[t]he fact that the vehicle made contact with [the officer's] body alone makes the circumstances of this case far graver and more immediate than the threat of bodily harm arising out of the encounters in *Long* and *Robinson*, neither of which involved the suspect's vehicle hitting the officer. Any misstep by [the officer] could have caused him to fall and be crushed under the weight of the moving vehicle." *Id*. at 1254.

Taking all reasonable inferences favorably to Underwood, clear Eleventh Circuit precedent compels the conclusion the undisputed facts establish a reasonable police officer would have perceived Underwood's Nissan as a dangerous threat capable of inflicting serious injury on Officer Partridge. At the time Officer Partridge fired on Underwood, the officers had arrived at a location where a domestic incident, including shots fired, had been reported. At the scene, they encountered two men apparently arguing, and, when the officers attempted to investigate, Underwood got into his car and did not comply with the officers' instructions to stop the vehicle. None of this would support the use of deadly force, regardless of whether the officers had reasonable suspicion sufficient to detain Underwood. But the character of the encounter changed as Underwood's Nissan continued to move towards Officer Partridge. It was only at that point, with the Nissan approximately eight feet away, that Officer Partridge began to fire at the approaching vehicle, and Officer Asarisi followed suit once he saw the Nissan hit Officer Partridge. Underwood explicitly does not dispute the Nissan was a deadly weapon that posed the threat of serious injury. (Doc. 58 at 8, ¶ 25). As in *Terrell*, and regardless of the fact that Officer Partridge was ultimately uninjured, the vehicle's contact with Officer Partridge created an even greater risk of bodily harm than it

25

would had it simply passed him. And, as in *Robinson*, the Nissan's slow rate of speed did not dispel that it could be a dangerous weapon when pointed at Officer Partridge. Under the totality of the circumstances, the officers had probable cause to believe Underwood's operation of the Nissan posed a dire threat to Officer Partridge when each began to fire.

Underwood challenges this determination by repeatedly stating that Officer Partridge "voluntarily" placed himself in front of Underwood's vehicle. (*See, e.g.,* doc. 53-1 at 29, 31; doc. 58 at 8). Using this characterization, Underwood attempts to demonstrate Officer Partridge created the danger to himself, which he says makes the force Officer Partridge used excessive under *Kirby v. Duva*, 530 F.3d 475, 482 (6th Cir. 2008), a Sixth Circuit case in which the court held "where a police officer unreasonably places himself in harm's way, his use of deadly force may been deemed excessive," and *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993), holding approximately the same. There are several problems with this. First, *Kirby* and *Starks* are not binding in this circuit, nor is the rationale that supports them (as discussed further below). Second, they are factually inapposite. In *Kirby*, the defendant police officers fired on a vehicle that was initially slow-moving, could not have actually hit any of the officers, and was stationary at the time of the shooting. *See* 530 F.3d at 483. Conversely, the Nissan was undisputedly moving towards and capable of hitting Officer Partridge at the time of the shooting. And in *Starks*, the vehicle was moving rapidly when the officer stepped in front of it, compared to the near-stop in this case. *See* 5 F.3d at 234. Third, the record does not support Underwood's assertion of officer-created danger. Underwood's sole citation to the record for this proposition is his attempt to "clarify" Defendants' factual statement "[Partridge] pulled his weapon because the vehicle coming toward him was a deadly weapon that posed the threat of serious injury," (doc. 43 at 5). Not disputing that fact,

26

Underwood points to Officer Partridge's testimony for the claim Officer Partridge "voluntarily took up a position in the path of Underwood's vehicle, which he claimed to perceive to be a deadly weapon and thereby imposed upon himself the very danger he now uses to justify his and Asarisi's use of deadly force." (Doc. 58 at 8). The cited portion of Officer Partridge's testimony reads:

> Q. Well, you perceived the car was a dangerous instrumentality?
>
> A. Yes, sir.
>
> Q. And yet you stepped out in front of it?
>
> A. It was a dangerous weapon when I – when I was in front of the vehicle. The vehicle continued to accelerate towards me. That's when it was a deadly weapon.
>
> Q. Why in the world would you step out in front of a deadly weapon?
>
> A. I couldn't tell from where the headlights were exactly what was going on. I was reacting in seconds to the situation.
>
> Q. But there's nothing that prevented you from remaining in a safe place on the other side of the road, was there?
>
> MR. PORTER: Object to form.
>
> A. No, sir.

(Doc. 37-6 at 26 (99:4-21)). However, Officer Partridge previously testified he had been walking across the street and had not made it fully across when he shined his flashlight on Ray, (*id.* at 13-14 (49:22-50: 23)), and that he was walking back across the street, towards the Nissan's driver's side, because it appeared that Underwood was stopping, (*id.* at 15 (56:8-2)). It is undisputed the Nissan continued to move towards Officer Partridge after this. When directly asked whether he intentionally placed his body in front of Underwood's vehicle, Officer Partridge responded "No, sir." (*Id.* at 17 (62:21-23)). It is unreasonable to conclude from this testimony Officer Partridge

made a conscious, voluntary decision to place himself into the danger his use of force was intended to quell.

Underwood also contends the shooting was unjustified under *Tennessee v. Garner*, 471 U.S. 1 (1985), in which the Supreme Court held it is unreasonable for an officer to use deadly force to prevent the escape of a felony suspect unless "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." (*See* doc. 58 at 23). Defendants do not attempt to justify the shooting on the basis Underwood had committed a felony, and whether the officers had probable cause to believe Underwood committed a felony is irrelevant to whether they had probable cause to believe the Nissan's movement towards Officer Partridge created the threat of serious injury or death. *See Shaw*, 884 F.3d at 1099 n.5. Nor is it relevant whether the officers had sufficient reason to believe Underwood was armed, as Underwood emphasizes, (*see, e.g.,* doc. 53-1 at 32-34); the threat the officers reasonably perceived was the Nissan as Underwood drove it towards Officer Partridge, not a potential firearm within the car.

Underwood argues the officers "did not bother to warn Plaintiff that they intended to fire upon him even though, according to their testimony, they had ample time to do so, since Asarisi screamed to stop the car multiple times throughout the exchange." (Doc. 53-1 at 31). Underwood also argues Officer Partridge could have removed himself from the street to avoid Underwood's vehicle or slid across the car rather than shoot at the vehicle. (Doc. 53-1 at 34; doc. 58 at 14, ¶ 39). This is not a reasonable view of the short, frenzied time between Officer Partridge stepping into the street and firing the first shots, in which the officers "were forced to make split-second judgments — in circumstances that are tense, uncertain, and rapidly evolving — about the amount

of force that is necessary in a particular situation." *Menuel v. City of Atlanta*, 25 F.3d 990, 996 (11th Cir. 1994). Regardless of whether the officers could conceivably have warned Underwood that they intended to use deadly force in the seconds that comprised the encounter, or whether "the facts show that [Officer Partridge] perhaps could have escaped unharmed," *Robinson*, 415 F.3d at 1256, the court may not use this sort of hindsight to conclude the officers' use of force violated the Fourth Amendment. Under the facts here, it did not.

Finally, and independently fatal to Underwood's claim, Underwood points to no clearly established United States Supreme Court, Eleventh Circuit, or Alabama Supreme Court decision law that would support that the officers violated his constitutional rights. *See Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003) ("In this circuit, rights are 'clearly established' by decisions of the Supreme Court, this court, or the highest court of the state in which the case arose."). Nor does Underwood otherwise attempt to demonstrate a clearly established right. Having failed to meet this burden, Underwood cannot defeat qualified immunity. But even if Underwood had addressed this issue, Underwood's only real challenge to the danger posed by the Nissan is that Officer Partridge created the danger to himself by stepping in front of it. Leaving aside that assertion is not factually supported, the Eleventh Circuit has recently rejected that the proposition Underwood advances is clearly established in this circuit. In *Knight through Kerr v. Miami-Dade County*, 856 F.3d 795 (11th Cir. 2017), a § 1983 excessive force plaintiff proposed as a jury instruction that "the Defendants are not justified in using deadly force if their own objectively unreasonable actions created the very risk that generated the eventual use of deadly force." The jury instruction was based in part on *Swofford v. Eslinger*, 671 F. Supp. 2d 1289 (M.D. Fla. 2009), *aff'd,* 395 F. App'x 559 (11th Cir. 2010), which relied on case law from the Sixth and

Seventh Circuits (including both cases Underwood relies upon for the same proposition).  *Knight*, 856 F.3d at 814.  *See also Swofford*, 671 F. Supp. 2d at 1305 (citing *Kirby* and *Starks*).  The district court declined to allow this jury instruction.  *Knight*, 856 F.3d at 814-15.  Affirming, the Eleventh Circuit stated there is "no decision from the Supreme Court, this Circuit, or the Florida Supreme Court clearly establishing that the plaintiffs' requested instruction is a correct statement of the law."[25]  *Id*. at 815.  Consequently, the officers are entitled to qualified immunity on this basis as well.

### b.   Count III - Malicious Prosecution

Underwood contends Officer Partridge and Officer Asarisi "maliciously caused [him] to be indicted on two counts of 'Attempted Murder,' and one count of 'Attempting to Flee the Scene of the Crime.'"  (Doc. 19 at ¶¶ 29, 47-50).

To establish a § 1983 malicious prosecution claim, "the plaintiff must prove a violation of his Fourth Amendment right to be free from unreasonable seizures in addition to the elements of the common law tort of malicious prosecution."  *Wood v. Kesler*, 323 F.3d 872, 881 (11th Cir. 2003).  The Eleventh Circuit has looked to both state and federal law for the elements of the common law tort.  *Id*.  Under Alabama law, those elements are (1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused.  *Id*. at

_____

[25] The undersigned has located no decision of the Alabama Supreme Court that would support this principle, either.

881-82 (citing *Uboh v. Reno*, 141 F.3d 1000, 1002-04 (11th Cir.1998) and *Delchamps, Inc. v. Bryant*, 738 So.2d 824, 831-32 (Ala.1999)).

It is not clear what Underwood contends is the Fourth Amendment violation that led to his allegations of malicious prosecution. His arguments appear to point to the shooting itself as an act of malicious prosecution, while his complaint refers to the fact he was indicted for offenses he presumably alleges he did not commit. If Underwood claims former, his claim fails because the shooting did not violate the Fourth Amendment. *See supra* at Section IV.A.1.a. If he contends something after the shooting represented the Fourth Amendment violation, it is unclear how Officers Partridge and Asarisi are connected to the criminal prosecution against him. As Defendants note, Underwood must show the "criminal prosecution was instituted or continued <u>by the present defendants</u>." (Doc. 43 at 15) (quoting *Wood*, 323 F.3d at 882). Underwood does not dispute the affidavits supporting the charges against him were filed by Detective Shadrick Williams, (doc. 37-12). Underwood states he "never would have been indicted but for the officers [sic] statements presented to the district attorney" and that Detective Williams' affidavit was "entirely based on Partridge's and Asarisi's statements," (doc. 58 at 35), but he points to no evidence to support either claim. This is insufficient to show the officers are the proper defendants for a malicious prosecution claim. *See Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir. 1994) (reversing denial of summary judgment when "none of the defendants had anything to do with the decision whether or not to prosecute" the plaintiff).

Even if Underwood could connect Officers Asarisi and Partridge to the decision to prosecute him, the causal connection between the defendant's acts and the constitutional violation required by § 1983 can be broken by the conduct of deliberate and autonomous decisionmakers.

31

*Troupe v. Sarasota County, Florida*, 419 F.3d 1160, 1165-66 (11th Cir. 2005). In the context of malicious prosecution, a prosecutor's decision to continue prosecution can sever the causal link between an arresting officer's conduct and the plaintiff's injury, *Whiting v. Traylor*, 85 F.3d 581, 586 n.10 (11th Cir. 1996), and a plaintiff may rebut this only by showing "that these intervening acts were the result of deception or undue pressure by the Defendants," *Barts v. Joiner*, 865 F.2d 1187, 1195 (11th Cir. 1989).

Defendants argue the intervening decisions by the district attorney to indict and the grand jury to return a true bill on the indictment severed the causal link between the prosecution itself and whatever conduct Underwood alleges Officers Asarisi and Partridge engaged in to initiate it. (Doc. 43 at 15). Underwood attempts to rebut this argument by stating Officers Asarisi and Partridge made false statements, "the equivalent of malice and deception," which lead directly to the charges. (Doc. 58 at 34). Underwood then points to the officers' statements that "dispatch told them there was a 'black male' with a gun," when the transcript clearly shows the information provided was a 'domestic with shots fired.'" (*Id*.). Because Officers Asarisi and Partridge were the only two witnesses who claimed the call included the suspect's race, Underwood states this "indicates at some point they corroborated their stories." (*Id*. at 34-35). Again, though Underwood points to no facts to support his contentions. Nor is his speculation about the district attorney's decision to bring charges sufficient to defeat summary judgment.

Even accepting Underwood's characterization of the prosecution (i.e., that it would not have occurred without the officers' statements, and it can thus be attributed to those statements), none of the alleged deception by the officers has any apparent relationship to the charges against him. Detective Williams' affidavits contain the following description of the incident:

32

> Officers responded to a domestic with shots fired call in the 1600 block of Holbrrok [sic] Ave.  The suspect Mr. Marcus Keonnie Underwood placed his 1997 Nissan Maxima in drive and accelerated towards victim, stricking [sic] the victim[26] as he was trying to get out of the way.  Officers fired shots at the vehicle, hitting Mr. Underwood several times.  Mr. Underwood drove off and crashed into a house a block away.

(Doc. 37-12 at 1-2).  Nothing in Detective Williams' recounting of the facts supports that he relied on the officers' misstatements that dispatch had informed them that a black male on the scene had a gun, nor is that relevant to whether Underwood drove his vehicle at the officers and then fled the scene — the basis of the actual charges.  The misstatements, even if deceptive (which, again, Underwood has not provided evidence to support), are simply too tangential to support the conclusion the decision to charge Underwood was their <u>result</u>.  Officers Asarisi and Partridge are entitled to summary judgment on Underwood's malicious prosecution count.

### c.  Count IV – Conspiracy

Underwood alleges the officers "unlawfully conspired to and did in fact submit false statements in the form of interview statements in which they stated that Underwood attempted to injure them while leaving the scene of the incident."  (Doc. 19 at ¶ 52).

To establish a § 1983 conspiracy claim, a plaintiff must show that "(1) the defendants reached an understanding or agreement that they would deny the plaintiff one of his constitutional rights; and (2) the conspiracy resulted in an actual denial of one of his constitutional rights." *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1327 (11th Cir. 2015).  "While a plaintiff need not come forward with a 'smoking gun' to show an understanding, he must 'show

---

[26] Detective Williams' affidavit for the attempted murder charge with respect to Officer Asarisi omits "stricking [sic] the victim."  (Doc. 37-12 at 1).

some evidence of agreement between the defendants' and willful participation." *Pittman v. State Farm Fire & Cas. Co.*, 662 F. App'x 873, 880 (11th Cir. 2016) (quoting *Bendiburg v. Dempsey*, 909 F.2d 463, 469 (11th Cir. 1990)).

Defendants contend there is no evidence of any agreement between Officers Asarisi and Partridge. (Doc. 43 at 15-16). Underwood again points to the fact the two officers were the only ones whose statements contend dispatch reported a black man with a gun at the scene, which is "proof enough of an agreement that these officers conspired in violating Plaintiff's constitutional rights." (Doc. 58 at 36-37). The commonality between the statements is insufficient to infer an agreement between the officers to violate Underwood's constitutional rights sufficient to meet the first element of conspiracy. And, as discussed above, there is no evidence these statements played any role in Underwood's prosecution, and thus no evidence that Underwood's constitutional rights were denied such that he could satisfy the second element either. Therefore, Underwood's conspiracy claim is due to be dismissed.

### 2. Municipal Liability

Both parties move for summary judgment on the issue of municipal liability. Underwood's basis is that Chief Rutledge ratified the use of force by Officer Partridge and Officer Asarisi "by rubber-stamping Harris's inadequate investigation." (Doc. 53-1 at 34). Opposing Underwood's motion, and in their own motion, Defendants contend Underwood has failed to offer any evidence there was a policy or custom of constitutional violations by the BPD, nor that municipal actors ratified the alleged constitutional violation beforehand. (Doc. 43 at 28-31; doc. 56 at 25-26).

"[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). This means that, "to impose liability on

a municipality under § 1983[, a plaintiff must] identify a municipal 'policy' or 'custom' that caused the plaintiff's injury." *Board of County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 403 (1997). The identified policy or custom must be "the moving force behind the constitutional violation." *City of Canton v. Harris*, 489 U.S. 378, 380 (1989). "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489 (11th Cir. 1997).

Because there is no underlying Fourth Amendment violation, Underwood's claims against Bessemer are due to be dismissed. However, even if there were a Fourth Amendment violation, Underwood has shown no evidence of a policy or custom by Bessemer to support its liability. Attempting to get around this, Underwood cites *Cooper v. Dillon*, 403 F.3d 1208, 1221 (11th Cir. 2005), as supporting "[a] municipality can be held liable for the deprivation of constitutional rights for the ratification of a single decision by a municipal policy maker." (Doc. 53-1 at 35) (emphasis added). Underwood misstates the holding of the case. *Cooper* quotes *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) for the proposition "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Cooper*, 403 F.3d at 1221. Neither *Cooper* not *Pembaur* contain any mention of ratification at all, and the Eleventh Circuit has rejected *Pembaur's* application to municipal liability through ratification. *See Salvato*, 790 F.3d at 1296-97. Nor does Underwood's cite to *Martinez v. City of Opa-Locka*, 971 F.2d 708, 713 (11th Cir. 1992) offer any support for his ratification theory. The sole case Underwood cites that discusses ratification at all, *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) (plurality opinion), does not support Underwood's theory either. Instead, that case supports that "when a

35

subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* at 127 (emphasis in original). It does not graft single-incident ratification exception onto the policy or custom requirement.

Underwood's attempt to impose municipal liability on Bessemer conflates the constitutional violation he alleges — the shooting — and the *post hoc* review of that constitutional violation. At no point does he allege the latter is a separate constitutional violation that, through Chief Rutledge's "rubber stamp," Bessemer may be held liable for it. This defeats his municipal liability claim. Underwood does not identify anything that would support a causal connection between Chief Rutledge's ratification and his injury, which necessarily happened prior to any deficient investigation into it. "[T]he failure to investigate a single incident, of which the [defendant] was unaware until after-the-fact, cannot ratify a constitutional violation." *Salvato*, 790 F.3d at 1295. Consequently, Underwood's claims against Bessemer are due to be dismissed.

### 3. Chief Rutledge (Individual Capacity)

As with Bessemer, Underwood's claims against Chief Rutledge in his individual capacity are due to be dismissed because there is no underlying Fourth Amendment violation. But even if there were, there is no supervisory liability under § 1983 on the basis of respondeat superior or vicarious liability. *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003). Instead, "to hold a supervisor liable a plaintiff must show that the supervisor either directly participated in the unconstitutional conduct or that a causal connection exists between the supervisor's actions and

the alleged constitutional violation." *Keith v. Dekalb County*, 749 F.3d 1034, 1047-48 (11th Cir.

2014).

> The necessary causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them.

*Cottone*, 326 F.3d at 1360.

There is no evidence Chief Rutledge directly participated in the shooting or Underwood's

prosecution, or made an agreement with any other defendant to violate Underwood's constitutional

rights. Similarly, there is no evidence of a custom or policy to support deliberate indifference, a

history of widespread abuse, or an inference that Chief Rutledge directed Officer Partridge and

Officer Asarisi to shoot Underwood. Therefore, Chief Rutledge is entitled to summary judgment

on Underwood's § 1983 claims against him in his individual capacity.

### B. State Law Claims

As with Underwood's § 1983 claims, the undersigned discusses each of Underwood's state

law claims by defendant.

### 1. Officer Partridge and Officer Asarisi

#### a. Count V – Assault and Battery

Underwood alleges the shooting was an assault and battery. (Doc. 19 at ¶¶ 55-58). Under

Alabama law,

> "Assault" has been defined as "an intentional, unlawful, offer to touch the person of another in a rude or angry manner under such circumstances as to create in the mind of the party alleging the assault a well-founded fear of an imminent battery, coupled with the apparent present ability to effectuate the attempt, if not

prevented." *Western Union Tel. Co. v. Hill,* 25 Ala. App. 540, 542, 150 So. 709, 710 (1933).... "'A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another.' " *Surrency v. Harbison,* 489 So.2d 1097, 1104 (Ala. 1986) (quoting *Singer Mach. Co. v. Methvin,* 184 Ala. 554, 561, 63 So. 997, 1000 (1913)).

*Harris v. Lombardi*, 897 So. 2d 1136, 1137-38 (Ala. Civ. App. 2004) (citation omitted). "The plaintiff in an action alleging assault and battery must prove (1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." *Walker v. City of Huntsville*, 62 So. 3d 474, 494 (Ala. 2010) (citation and internal quotation marks omitted). "However, Alabama applies additional rules when a police officer commits an alleged assault and battery: "'[i]n making the arrest, a police officer may use reasonable force and may be held liable only if more force is used than is necessary to effectuate the arrest."' *Id.* at 494 (quoting *Franklin v. City of Huntsville*, 670 So.2d 848, 852 (Ala. 1995) (citing Ala. Code § 13A-3-27(a)))." *Dial v. City of Bessemer*, No. 2:14-CV-01297-RDP, 2016 WL 3054728, at *12 (N.D. Ala. May 31, 2016).

Defendants argue Underwood's assault and battery claims are identical to his excessive force claim, and that they are entitled to summary judgment for the same reasons. (Doc. 43 at 19-20). In support, they cite *Walker v. City of Huntsville*, 62 So. 3d 474 (Ala. 2010), in which the Alabama Supreme Court held a plaintiff's assault and battery claims against a police officer were barred by collateral estoppel after a federal court, resolving the same plaintiff's § 1983 excessive force claim, determined the police officer's use of force did not violate the Fourth Amendment. Underwood does not respond to this argument, although he presumably relies on his arguments in

support of his excessive force claim. As there is no Fourth Amendment violation, Officers Asarisi and Partridge are entitled to summary judgment on Underwood's assault and battery as well.

### b. Count VIII – Outrage

Underwood's tort of outrage claim consists of the allegation Defendants "intentionally or recklessly caused [him] to suffer great physical injury and emotional distress and . . . other injuries and damages . . . ." (Doc. 19 at ¶¶ 67-70). "The elements of the tort of outrage are (1) that the defendant either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from its conduct; (2) that the defendant's conduct was extreme and outrageous; and (3) that the defendant's conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Jackson v. Alabama Power Co.*, 630 So. 2d 439, 440 (Ala. 1993) (citation omitted). The Alabama Supreme Court has recognized the tort of outrage in three areas: "(1) wrongful conduct within the context of family burials; (2) an insurance agent's coercing an insured into settling an insurance claim; and (3) egregious sexual harassment." *Callens v. Jefferson County Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000). "Outside of these categories, shocking conduct is often deemed by Alabama courts to be insufficient to create a jury question." *Styron v. City of Foley*, No. CIV.A. 03-0572-CG-L, 2005 WL 3098926, at *6 (S.D. Ala. Nov. 18, 2005) (collecting cases).

Defendants state Underwood's outrage claim is not viable because it does not fit into one of these previously-recognized categories. (Doc. 43 at 21). Underwood admits the limited applicability of the tort of outrage, but contends the evidence supports a genuine issue of material fact as to whether the shooting was egregious enough to support it, and speculates the Alabama Supreme Court might recognize the applicability of the tort in this case. (Doc. 58 at 38).

Regardless of whether the Alabama Supreme Court is inclined in the abstract to expand its definition, the undersigned has concluded the officers shot Underwood in reasonable fear of serious injury or death. It follows that their actions were not extreme and outrageous to support Underwood's tort of outrage claim.

### c. State Law Immunity

Defendants also contend Officers Partridge and Asarisi are entitled to peace officer immunity and state agent immunity.

Under Alabama law, peace officer immunity is a statutory creation:

> Every peace officer and tactical medic, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as a peace officer or tactical medic by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers or tactical medics, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties.

ALA. CODE § 6-5-338(a). State agent immunity is a judicially created doctrine:

> Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." *Ex parte Hayles,* 852 So.2d 117, 122 (Ala.2002). In *Ex parte Cranman,* 792 So.2d 392 (Ala.2000), a plurality of the Alabama Supreme Court restated and clarified the scope of Alabama's state-agent immunity doctrine, which bars suit against law enforcement officers effecting arrests, except to the extent the officer acted willfully, maliciously, fraudulently, in bad faith, beyond his legal authority, or under a mistaken interpretation of law, or if the Constitution or laws of the United States or Alabama require otherwise. *Id.* at 405.

*Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 740-41 (11th Cir. 2010). However, the test for both is the same. *Ex parte City of Tuskegee*, 932 So. 2d 895, 904 (Ala. 2005) ("The restatement of State-agent immunity as set out in *Cranman*, 792 So. 2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a).") Under *Cranman*, the defendant has the initial burden to demonstrate that he was acting in a discretionary function within the scope of his duties. *Ex parte Estate of Reynolds,* 946 So.2d 450, 452 (Ala.2006). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." *Id.*

Underwood does not contest state law immunity except to restate the law and argue the officers' willfulness, maliciousness, or bad faith is a jury question, and that "a jury could find malice and bad faith when an officer arrested a person with no grounds to believe that the person had committed an offense."[27] (Doc. 58 at 37) (quoting *Walker v. Briley*, 140 F. Supp. 2d 1249, 1263 (N.D. Ala. 2001). However, Underwood does not identify any evidence that would support willfulness, maliciousness, or bad faith such that he can survive summary judgment. Additionally, the undersigned has concluded Officers Asarisi and Partridge had probable cause for the shooting, the seizure at issue here. Thus, the officers are entitled to state agent immunity.

### 2. Bessemer and Chief Rutledge

Defendants contend Bessemer is entitled to immunity from state law claims. (Doc. 43 at 31-33). Specifically, they contend Alabama law contains an exception to the general rule of

---

[27] Underwood notes state immunity under *Cranman* utilizes a burden-shifting framework, but does not argue Defendants have failed to meet their burden to demonstrate Officers Partridge and Asarisi were engaged in a discretionary function. (Doc. 58 at 37).

municipal immunity only when a plaintiff has been injured by "the neglect, carelessness or unskillfulness" of its agents or employees. (*Id*. at 31-32). Because assault and battery and outrage are intentional torts, and because the municipality cannot be liable for its own torts (i.e., negligent hiring and negligent training and supervision), Defendants state all the claims fall outside the exception to municipal immunity. (*Id*. at 32-33).

As to Chief Rutledge, Defendants argue there is no evidence to support his intent to commit either assault and battery or the tort of outrage, and in any event Chief Rutledge cannot be vicariously liable for the torts of Officers Asarisi and Partridge because he is, at best, a supervisor, and Alabama law does not recognize supervisory liability for the torts of their subordinates. (Doc. 43 at 26-27) (citing *Ware v. Timmons*, 954 So. 2d 545, 555 (Ala. 2006)). They also argue Chief Rutledge is entitled to peace officer immunity and state agent immunity. (27-28).

Underwood does not address any of these arguments. Therefore, his state law claims against Bessemer and against Chief Rutledge are abandoned and due to be dismissed. *See Coalition for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("The appellants' failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned."); *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (dismissing undefended claims on summary judgment); *Hudson v. Norfolk S. Ry. Co.*, 209 F. Supp. 2d 1301, 1324 (N.D. Ga. 2001) ("When a party fails to respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned.").

## V. Conclusion

For the reasons stated above, Defendants' motion for summary judgment, (doc. 43), is **GRANTED**, and Plaintiff's motion for summary judgment, (doc. 45), is **DENIED**. All remaining motions are **DENIED AS MOOT**. A separate order will be entered.

DONE this 12th day of September, 2019.

_____
**JOHN H. ENGLAND, III**
UNITED STATES MAGISTRATE JUDGE